## Charles Lynch v. The State.

### No. 2101. Decided March 21, 1900.

**1. Disturbance of the Peace—Illegal Arrest by Officer.**

An officer who, without a warrant attempts the arrest of a party for disturbing the peace which has not been committed in his presence or view, and who did not state to the party he was attempting to arrest that he was an officer and the reason why he was arresting him, is himself making an illegal arrest, and the party he is attempting to arrest has the same right to defend himself against such illegal arrest by the officer as he would have against any other citizen.

**2. Same—Charge.**

By provision of article 247, Code of Criminal Procedure, a peace officer is authorized, without warrant, to arrest a party disturbing the peace where the offense is committed in his presence, or view; but where the offense has not been committed in his presence or view, it is error for the court to instruct the jury that such officer may arrest a party without warrant when he is committing an offense against the public peace.

**3. Same.**

Where an officer undertakes to make an arrest he must make known his authority as such officer and the reason for the arrest, unless prevented from doing so, otherwise he is attempting an illegal arrest; and where the evidence shows that the officer had the opportunity but failed to do his duty in this respect, it was error for the court to charge the jury in effect that if the officer's purpose and capacity are known to the party whose arrest is attempted and the arrest is otherwise lawful, it is the duty of such party to submit to such arrest, and resistance by him would be unjustifiable.

**4. Assault with Intent to Murder Officer—Attempting an Arrest Without Warrant—Special Instruction.**

On a trial for assault with intent to murder an officer attempting without a warrant an arrest for disturbance of the peace, the court erred in refusing to give in substance to the jury a special requested instruction presenting defendant's theory of the case as follows, viz.: "There is not sufficient evidence adduced in this case to prove that defendant, prior to the time of the difficulty which resulted in the shooting of T., had committed any such offense in the presence or view of said T. as would authorize said T. to arrest defendant without a warrant issued by some competent court commanding such arrest, and therefore you are instructed that the said T. had no right to arrest or attempt to arrest defendant; and you are further instructed that defendant had the right to defend himself against an attempt by said T. to arrest him or take away from defendant any property; and in such defense of himself or his property defendant had the right to use all such force as was necessary to prevent such arrest or such taking away of his property, even to the extent of killing the said T. if such killing was necessary to prevent such arrest or such taking away of his property."

**5. Illegal Arrest—Self-Defense—Manslaughter—Charge.**

On a trial for an assault with intent to murder, where it appeared that the assaulted party was an officer who was illegally attempting the arrest of defendant, the court should have charged fully upon self-defense, and as a killing to avoid illegal arrest would have been manslaughter, a charge upon manslaughter should also have been fully given.

Appeal from the District Court of McLennan. Tried below before Hon. Sam R. Scott.

Appeal from a conviction of assault to murder; penalty, two years imprisonment in the penitentiary.

Appellant was charged by the indictment with an assault with intent to murder one G. W. Tilly, on the 14th day of June, 1893.

The important facts attendant upon the alleged offense are stated fully in the opinion.

*J. W. Taylor, W. H. Lessing,* and *John L. Dyer,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of an assault with intent to murder. As usual, there are two theories presented by the evidence. That for the State discloses that about 11 o'clock at night the alleged assaulted party, Tilley, constable of the precinct in which the village of Moody is situated, was sitting in an ice-cream parlor. One or more shots and some yelling was heard out on the street. He immediately left the room, got on his horse, and went in the direction of the noise. This was 200 or more yards distant. Tilley testified that in galloping up the street, and when he came within fifty or sixty feet of a man walking along the street, he heard him yell, and ascertained it to be defendant. He approached defendant, who was on foot, and said, "Hold up there, Mr. Lynch;" and Lynch said, "What is that for?" "I said, 'Hold up, and give up that pistol; you are cutting up here, disturbing the peace.' I checked my horse about the time he said, 'What is that for?' and about the time I got still he was about a step in front, and to the right. I dismounted, and probably moved a little, but had not much more than struck the ground, until there was the report of a pistol, and it struck me in the breast. I knew I was shot. At the same time he presented the pistol again, and I grabbed it, and it caught me right in the hand. There is the scar. I grasped his pistol, and I pulled my pistol then, and as soon as I pulled it defendant grabbed it. I had a 44 Smith & Wesson pistol, and in the scuffle he had hold of my pistol and I had hold of his. Jerking and scuffling around, my pistol was unbreeched. However, while he had hold of my pistol, I got it turned around towards him, and snapped it at him, but it would not fire. Then he gave me a shove, and I stayed on my feet, and held both pistols, and he started to run, and I chased some bit, and I think I struck him on the arms. * * * When I followed defendant after the shooting I was trying to arrest him, and told him so. I followed him over 100 feet." On cross-examination he states: "It was 200 yards over to where I overtook him. The first thing I said to him was 'Hold up, Mr. Lynch.' He said, 'What is that for?' I said, 'Give up that pistol; you are hallooing out here in the streets, and cutting up and disturbing the peace, and shooting off your pistol.' I had not seen any pistol on him at that time, and no one had informed me that he had a pistol." Coombes testified for defendant that he remembered the shooting in question. "I was twenty or thirty steps from the difficulty. Had just gone to bed. Had not been asleep. I had not heard any pistol shots just previous to that, and had not heard any hallooing. I was in the

front part of the house next to the street. Had been working at the gin, and worked late. I went up to the difficulty. I heard the pistol shots at that time. I did not hear any conversation between Lynch and Tilley before the shot was fired." Defendant testified that he knew Tilley; that up to the time of this difficulty they were friendly; that he was running a butcher shop, and had gotten through his work, and started home. "Just before I got up to the house, some one rode up and said, 'Give me that gun.' I said, 'What right have you to my gun?' By that time he got off of his horse, and said, 'You will go back with me to town.' I said, 'I am going home; I am not going to town.' At that time he struck me, and before I could do anything he struck me again. I thought he had shot me at that time. I saw about as much fire as if he had. That knocked me down, and then he snapped his gun at me while I was getting up. I had a little old pistol my wife had left at the shop that evening, and I expected his gun to go off every minute, and as soon as I could get in a position I snapped mine at him and it went off. At that time we got up close together. I was trying to catch his gun, and he struck me on the arm. We got hold of one another's guns, and we were pulling and scuffling. * * * I know the location of the depot. It was about 175 or 180 yards from the depot to where Tilley accosted me. As I was going home I was not creating any disturbance, nor hallooing. I was just walking on home. I had not fired my pistol at all. Tilley came up on horseback. I did not recognize him at that time. He did not tell me what he wanted with me. He did not order me to surrender, nor offer to arrest me. It was after he got off his horse that he hit me. He did not make himself known as an officer of the law, nor that he was trying to arrest me as an officer. It was about 250 yards from my shop to my home. I was then within thirty or fifty yards of my gate. The man on horseback came towards me in a lope. When I shot I was getting up, or about up. His first blow rattled me right smart, and the second one knocked me down. I don't remember whether I made any further attempt to shoot him. He tried all the time to shoot me, twisting his pistol on me, and snapping it at me. * * * It is not a fact that I hallooed and shot off my pistol between my place of business and where the difficulty occurred. I heard no pistol shot. His first words to me were, 'Give me your gun.' I did not know his voice. When I shot him I heard the report of my gun. I did not know whether I had hit him or not." The evidence is clear that the head of defendant was pretty badly bruised and beaten, and also that his arm was hurt. Tilley was shot through the breast. There is a considerable mass of testimony that we deem unnecessary to collate.

The court charged the jury: "If any person shall go near any private residence, or into a street of a town, and yell or shriek in a manner calculated to disturb the inhabitants, such person would be guilty of disturbing the peace." And further: "A peace officer may, without warrant, arrest an offender, when the offense is an offense

against the public peace." He further charged: "The law requires that in making an arrest the officer must make known to the accused by what authority the arrest is made. If he has time or opportunity, it is his duty to do so, and whether or not the officer has such time and opportunity is a question of fact to be determined by the jury from all the facts and circumstances in evidence. While it is the duty of an officer attempting to arrest to make known his purpose and the capacity in which he acts, if, however, that purpose and capacity are known to the party when an arrest is attempted, and the arrest is otherwise lawful, submission to arrest is a duty, and resistance is unjustifiable." This portion of the charge is criticised in the motion for new trial. The charge, under the facts of this case, is erroneous. Article 247, Code of Criminal Procedure, provides: "A peace officer or any other person may, without warrant, arrest an offender when the offense is committed within his presence or within his view, if the offense is one classed as a felony, or as an offense against the public peace." Article 278, Id.: "In executing a warrant of arrest, it shall always be made known to the person accused under what authority the arrest is made, and, if requested, the warrant shall be exhibited to him." Where an officer undertakes to make an arrest, he must make known his authority as such officer, and the reasons for the arrest. Plasters v. State, 1 Texas Crim. App., 673. There is no evidence in this record showing that appellant did anything which prevented the officer from making himself known as such, and his reasons for desiring the arrest of defendant. His own testimony shows he had ample time and opportunity to make these matters known to appellant before he dismounted from his horse. So the record leaves it undisputed that this was an attempted illegal arrest; and this is true, although the officer may have heard defendant yelling and identified him as the man who was doing the yelling when he was within sight of him. But it is not clear that he knew who it was until he rode up on him. If we look to the defendant's testimony, we find that he did not even know who the officer was when approached by him, and he went so far as to inquire why it was he wanted to take "his gun." He states he did not recognize the voice as that of Lynch. So far as the character of the offense of which the officer says Lynch was guilty, it must be committed within the view of said officer, in order to justify his arrest without warrant, and the same precautions as to making himself known and demanding the surrender of the party obtains where the arrest is sought without the warrant as where sought by virtue of a warrant. These charges do not correctly state the law of this case.

Appellant requested the following instruction: "There is not sufficient evidence adduced in this case to prove that defendant, prior to the time of the difficulty which resulted in the shooting of Tilley, had committed any such offense in the presence or view of said Tilley as would authorize said Tilley to arrest defendant without a written war-

rant issued by some competent court, commanding such arrest; and therefore you are instructed that the said Tilley had no right to arrest or to attempt to arrest defendant; and you are further instructed that defendant had the right to defend himself against attempt by said Tilley to arrest him or to take away from defendant any property; and, in such defense of himself or his property, defendant had the right to use all such force as was necessary to prevent such arrest, or such taking away of his property, even to the extent of killing said Tilley, if such killing was necessary to prevent such arrest or such taking away of his property." This was refused. Perhaps this charge might be subject to some objection; still, it presented defendant's theory of this case, and, in substance, should have been given. If defendant's testimony is to be believed, he was walking quietly along the street returning from his business house to his home,—had committed no violation of law, and was not subject to arrest with or without warrant,—when the officer approached, dismounted from his horse, and struck him twice over the head with a pistol, and, as the defendant believed at the time, had shot him. He did not make himself known as an officer. The officer stood in the same relation to defendant, under these circumstances, as any other citizen; and defendant had the right to defend under this state of facts.

The charge on manslaughter is also criticised. While the court submitted this issue, he did it in such a restricted manner as not to conform to legal requirements. An attempted illegal arrest of a party is deemed in law a great provocation, and a party killing to avoid an illegal arrest is usually guilty of no higher offense than manslaughter. And upon this theory it is immaterial whether or not he used greater force than was necessary. If he had killed, this would have reduced, as above stated, under ordinary circumstances, the killing to manslaughter. Self-defense and manslaughter should have been fully given in the charge. For the reasons indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

BROOKS, Judge, absent.